I'd like for the attorneys to please step up to the podium. Both attorneys, please step up. I want you to state your names, tell me who you represent, and approximately how much time your argument will take. Good morning, Kelly. Good morning. My name is Charlie Adams. I represent the plaintiff, the epilogue, here, Bob Welsh. I expect that my argument will take not more than ten minutes, and I'd like to save an additional five for rebuttal, with the court's permission. Very good, Mr. Adams. Good morning, Counsel. Good morning, Your Honors. My name is Andrew Rosenman of Mayor Brown, LLP. I represent the appellee of the Big Ten Conferencing, and with me this morning is my colleague, Emily Emerson, also from Mayor Brown, but I will be presenting the argument. How much time will the argument take? We'd like about 15 minutes. Very good. Good morning, Counsel. All right, you have a seat. Mr. Adams, why don't you proceed with your argument? Thank you, and may it please the Court. I will try to be as brief and direct with my comments this morning as I was in our opening brief. I will start by acknowledging the discovery and proof problems that we expect to deal with if and when this Court grants the relief requested in our appeal, which is reversal of the dismissal under 2-619A7 pursuant to the statute of frauds. Those discovery and evidentiary challenges are highlighted in many of the summary judgment cases that are relied upon inappropriately, we'd suggest, in the Big Ten's brief on the statute of frauds issue. As a pleading, and if this Court adheres scrupulously to the standards for evaluating the pleading under either 2-619A7 or 2-615, this pleading should go forward in the circuit court. It is true, Counsel, that there are two different standards. If we consider this matter based on 2-619, there's one standard. But if we consider it based on 2-615, there's a different standard. You will agree with that? I absolutely agree with that, and I respectfully believe that if this Court applies each of the standards to count two of the Second Amendment complaint, first as a 2-615 challenge, it survives as a well-stated, sufficiently pled breach of contract claim. Offer, acceptance, consideration, performance by Walsh and Breach are all alleged, perhaps too redundantly, but they're there, and we believe that Judge McGrath got that part of the proceedings right, that count two states a claim for breach of contract. We believe that the part that Judge McGrath missed below was that Walsh has sufficiently alleged under the 2-619A7 standard his full performance to defeat the Big Ten's assertion that the statute of frauds prevents Walsh from going forward on the breach of contract claim. I follow your argument. What damages were incurred, if any? We believe that's a discovery and proof issue that will be addressed in the Circuit Court if the Court remains the case. At a minimum, Your Honor, we believe that Walsh is entitled to be compensated for his time and effort in preparing the plan. We also believe that Walsh is entitled to be compensated for the value of his ideas that the Big Ten shared with and disseminated to others in breach of its confidentiality agreement. What about these letters in April? There are two letters. How should I interpret those? You can interpret the one, which is Exhibit B to the pleading, as the Big Ten's confirmation that it would hold Walsh's ideas in confidence without time limitation. The second letter is a qualification on the Big Ten's willingness to go forward with the broader idea is to develop the concepts. And I imagine, couldn't be I, I'm not that smart, but I imagine back in the 90s a lot of people were thinking about the internet and how to use it to make profit. How was his idea unique to all these others? And didn't the second letter even talk about that? The second letter talked about the proprietoriness as distinguished from the confidentiality of Walsh's ideas. And whether the Big Ten was willing to treat Walsh's ideas as his proprietary property or whether the Big Ten sought to go forward with Walsh in developing Walsh's ideas are different in terms of Walsh's claim for breach of contract than the Big Ten's promise, their enforceable promise, to hold his ideas in confidence. The contract that's alleged here is one of the oldest known playground contracts. And that is, I'll tell you my secret if you'll keep my secret. And there is no time limitation on that. And we have cited several cases in our reply brief to address this idea that the doctrine of full performance doesn't apply because the defendant's obligation here to hold Walsh's ideas in confidence were of indefinite duration. Help me out, counsel. Yes, sir. You're alleging that the idea was a novel idea. That the sum of the parts was novel. And if I may, the Big Ten in those two letters acknowledged this much. Did they also not say in those letters, though, that other people had approached them with similar type ideas? They did. It was not a novel. That's correct. And therefore, as we go forward in the circuit court, as matters of discovery and proof at trial, we'll have to demonstrate that the Big Ten network, as it has evolved and made millions going on billions for this defendant, that the Walsh ideas were the seed for that and not some of these other competing suitors. What Walsh presented at that 18 May 1998 meeting was the core of what has become the Big Ten network. And in the second of the two letters, I believe, Exhibit C to the pleading, although they're both dated the same date, Delaney, the commissioner of the Big Ten, characterizes Walsh's plan and Walsh's ideas in many ways that acknowledge its value as recognizing potential synergies and new opportunities. Walsh has never claimed that the idea, for example, of televising sporting events was his idea or was a new idea. What he offered in his plan and then in his presentation at the 18 May meeting was a way to pull together a variety of aspects of the Big Ten sports branding to add value. And Delaney's own words in those letters acknowledge that Walsh's ideas brought that to the table. And Walsh's complaint alleges that he fully performed on his part of that contract, that is, he disclosed and he presented at the 18 May 1998 meeting. Did not the letter that the Big Ten commissioner sent say that this is just a letter of interest only and that there's not a binding obligation on us and that we would just kind of, you can come in and share your ideas with us, but there's nothing binding here or did I read that wrong? Respectfully, I believe that you have read one of the two letters incompletely. Delaney says in Exhibit B to the Second Amendment complaint that the conference acknowledges the confidential nature of the plan. It's in Exhibit C that he hedges and says that they're not going to commit at that time to going forward with the collaboration that Walsh has in mind. But that second letter, Exhibit C, does nothing to equivocate on the promise that's alleged here to hold the Walsh plan and Walsh's ideas in confidence. The Second Amendment complaint goes further then and alleges that at the time of the meeting itself, Walsh made an explicit precondition of presentation of his plan to all those assembled, including the athletic directors from the constituent universities, that they keep this plan in confidence. Every page of the plan document is stamped confidential. There is on the front of the plan document an unambiguous, explicit confidentiality notice. The complaint alleges, and under 619A7, the court in considering whether full performance has been sufficiently alleged, has to accept that, that Walsh made that an explicit condition precedent of going forward and that by their words and actions, the Big Ten accepted and Walsh, then in reliance on that acceptance, went forward and disclosed the plan and presented his ideas. Counsel, will you help me out and tell me exactly when the Big Ten accepted your offer to keep this matter confidential? When did that occur? Twice, Your Honor. First, in Delaney's 23 April letter where he acknowledges its confidentiality and the invitation to Walsh to come in and present the plan. And a second time it confirms or reaffirms, and I think those are the very terms used in the pleading, their acceptance when Walsh stands up in front of this group and explicitly makes his willingness to present the plan to the assembled representatives of the defendant conditioned on their continuing agreement to hold its contents in confidence. But as Justice Steele pointed out, the letter also says that second letter, Exhibit C, it is understood, however, that this is a letter of interest only and is subject to the conference's satisfaction with the development of the proposed venture, the approvals of the board, various committees and groups of the conference, and the negotiations and execution of definitive agreements, which seems to suggest that some other things have to occur before anything is accepted. But before the Big Ten conference and Bob Walsh go forward with the collaboration that Walsh has proposed, we agree and don't dispute that that second letter, Exhibit C, doesn't commit the Big Ten to going forward with the broader proposal in collaboration with Walsh. We take issue with the Big Ten's assertion that that letter gets them off the hook of its earlier written promise to treat Walsh's ideas and plan as confidential. Are you saying that that agreement can go on and on and on? Yes. And no Illinois case holds otherwise. There's none saying it's okay. Well, respectfully, Judge, I think the three cases that we have cited and the provision of the Trade Secrets Act, which explicitly excludes contracts to maintain confidentiality from its preemptive scope, provides that a contract duty to maintain secrecy is not void or unenforceable solely for lack of durational limitation on that duty. And the cases that we cited, the Cody case involving Harpo Studios, the Mose, NOES, GES case, and I think the case that best illustrates that this can be a truly indefinite commitment on the part of a defendant, is the estate adjustment case that is an oral contract to make a will where the claimant in probate said that he had done all the things in full performance of his obligations to be a beneficiary under a will. You cited some cases. But do you have any cases as to confidentiality agreements going on? Yes. The cases I just named, the Cody case. Did it involve confidentiality agreements? Yes, it did. The Mose, GES case and the estate adjustment wasn't a confidentiality contract. It was a contract to make somebody a beneficiary under a will. But that was cited to make the point that that was obviously of indefinite lifetime duration. Counsel, let me ask you this question. Since the first April 23rd letter makes it very clear that some of the concepts that you maintain should be kept confidential, the Big Ten was already aware of. Which concepts are supposed to be kept confidential and which are non-confidential, since they're already aware of some of your concepts? It's the sum of the parts, Your Honor, of the Welsh plan. And Delaney acknowledges that the sum is greater than the sum of the parts. Then answer this question. If the Big Ten was already aware of some concepts, they wouldn't be required to keep those confidential, right? In isolation, that's correct. Okay. So which concepts were they unfamiliar with that they should have kept confidential? The coordination, and I'm using now words from Delaney's letter characterizing the value of the Welsh plan. The coordination of championship events and the marketing of related rights provide exciting synergistic opportunities. In the Welsh plan, Delaney there is talking about host cities for particular championship events, for particular sports in affiliation with restaurant promotions and apparel promotions, and tying all these things together, particularly to add value to sporting championship events, which to that point had not been profitable revenue-generating events for the conference, not football and basketball, the wrestling, many of the women's sports, that hadn't drawn a lot of attention and brand value to that point. Welsh's plan describes ways to derive value for those championship events like the basketball tournament. It's your position that this oral contract was sufficiently definite that we could enforce it? Yes. That's all I have. Okay. You may proceed. Thank you, Your Honors. May it please the Court, the Illinois Supreme Court emphasized in McInerney v. Chartergolf that the statute of frauds is designed to protect courts and juries from charlatans, perjurers, and problems of proof accompanying oral contracts. This case, Your Honors, represents a textbook example of why the statute is in place. As Justice Murphy pointed out, Welsh has not presented to this Court a single case in Illinois or anywhere else that even suggests, much less holds, that a party can fully perform an oral confidentiality agreement of limitless duration through the simple act of presenting a proposed business plan to a potential business partner or investor. So what's your lead case that says you can't? We've cited three cases, Your Honor, from other jurisdictions. And in Illinois, that's my point. Exactly, yeah. To our knowledge, this is the first time this issue has come up specifically in this context in Illinois. But to our knowledge, no court in any jurisdiction ever has recognized the full performance exception to the statute of frauds in the context of a confidentiality agreement in circumstances like this. And we at least cited a few cases in other jurisdictions that clearly reject it in the context of confidentiality agreements. Welsh's reply, as well as his opening argument, didn't discuss any of those cases. If this Court were to adopt Welsh's argument, the breach of confidentiality claim would be no less viable had the conference announced the introduction of the Big Ten Network, not in 2006, but in 2056, even though witnesses surely would die, memories would fade, and evidence would be stale by that point. It's very easy to think of many other illustrations, and Justice Murphy alluded to one involving the Internet, suppose, for example, that a plaintiff sues Apple and says, 20 or 30 years ago, I came up with the idea of a computer tablet, and I disclosed it orally and in confidence to Apple. And then, just a couple years ago, they introduced the iPad. Well, they breached my oral confidentiality agreement, which had no durational limit whatsoever. The evidentiary problems, memory problems, and the issues of proof that would arise in that circumstance are precisely why the statute of frauds is in place. It's an evidentiary safeguard that's designed to prevent the problems and risks of abuse, frankly, that would occur in those circumstances. Welsh incorrectly conflates, and I think this is one of the fundamental problems of his case, a breach of confidentiality with misappropriation or conversion of his alleged property. There's no breach of contract simply by virtue of the fact that the conference later introduced the Big Ten Network. There's nothing alleged in the second amendment complaint. There's nothing in Welsh's business plan that suggests that he tried to place any limitation on the conference's rights to develop its own network. The fact is the conference has the legal right to develop its own network with or without Welsh's input in the absence of some restriction on its ability to do so, and there's no allegation whatsoever that suggests that there was any limitation. Having lost and then not appealed his trade secrets claim before this court, Welsh cannot make an end run around the Trade Secrets Act by essentially claiming that by virtue of developing a network, the conference somehow breached a confidentiality agreement. Now I'd like to turn briefly to the three Illinois cases on which Welsh principally relies in this reply brief. The first case, and it's one that Mr. Adams mentioned in his argument, is Cody v. Harpo, Inc. He cites it for the proposition that confidentiality agreements of limitless duration are recognized in Illinois. But the problem is that Welsh didn't mention the most important fact in that case, which is that the plaintiff signed a written confidentiality agreement. In addition, there was a written confidentiality policy of Harpo, which basically restricted any employee's ability to write a tell-all book about his or her work at Harpo on the Oprah Winfrey show. The plaintiff in the case sought a declaration that her written agreement and that this written confidentiality policy wouldn't preclude her from writing this type of a tell-all book. But because a written confidentiality agreement existed, there was no statute of frauds issue in the case. And in fact, the court's opinion doesn't even discuss the statute of frauds. So Cody is very much unlike the facts of this case. And in fact, the plaintiff in Cody didn't even appeal the dismissal of her breach of contract claim. The only issue in the case was the declaratory judgment came in which this district affirmed dismissal of the claim. And the reason that the First District affirmed dismissal is because of an important public policy concern that arises in the employment context, namely that post-employment restrictive covenants, quote, have a social utility in that they protect an employer from the unwarranted erosion of confidential information, unquote, which is 308 ILAP 3rd of 161. There are no such public policy concerns at issue in this case. The second case that Welch cites is Nosgis v. ServiceMaster. And in that case, the defendant hired the plaintiff to develop a computer software program, an accounting and business package for the defendant's clients, and then to develop, beta test it, and make ready for distribution the computer software package. The plaintiff alleged that there was a set compensation formula to which the parties had agreed and that he did all the things that were required of him under the contract. The software package was developed. It was beta tested. It was made ready for distribution. It was, in fact, distribution. And then his claim basically was the defendant didn't pay me for the work that I had already performed. And so in that circumstance, the plaintiff did everything that was expected of him. Here, in contrast, the conference never employed Welch, never agreed to pay him anything, never even asked him to develop a business plan in the first instance. What happened? Well, Welch solicited the conference, reached out to him, presented this proposed business plan. Jim Delaney promptly disclaimed any contract or proprietary rights. Welch, nevertheless, proceeded with a business meeting on May 18th of 1998. And then nothing happens for 10 years until he files a lawsuit. Nosgus also was distinguished, I think, in the more recent case from this district. Nosgus was a second district case. Rote versus Rote, which we cited in our brief, in which the court rejected application of the full performance doctrine and affirmed dismissal under 2619A7 because the parties clearly anticipated continuing performance over a period of several years. In addition to Rote, we cited some other cases on pages 23 and 24 of our brief that explain that where continuing performance is anticipated by the parties over a long duration, the full performance exception does not take the case out of the statute of frauds. Again, Welch's reply didn't discuss any of those cases. Mr. Adams didn't address them either. The last Illinois case on which he relies, and he cited in his argument, is the state of Jesuit. Now, in that case, the plaintiff worked for more than two years as a caregiver to the decedent. But at the outset of her employment, she allegedly was told, we're going to take care of you financially, because she had moved from Colorado to Illinois to take care of her older relative. She performs those services for two full years. And then after the decedent's death, claims that she's entitled to compensation from the estate. There was no express contract issue in the case. The issue that arose was whether or not there was an implied in fact contract. And, of course, we know that the standards for breach of an implied in fact contract are different from those of an express contract. In fact, Welch began this litigation in federal court by alleging, in his very first complaint, that he had an implied in fact contract. We moved to dismiss it based on the fact that there was no allegation that he was entitled to any expectation of compensation. Welch then promptly changed his theory to breach of contract, and that's what he's pursued ever since. In Jesmer, the plaintiff's full performance for services over two years, based in reliance on, and in reliance, reasonable reliance, on the decedent's promise to her that he would take care of her financially, cannot be equated to Welch's singular presentation of a proposed business plan in 1998 that the conference not only disclaimed, but promptly rejected. I would add one other point about Jesmer, which is that the Court mentioned the statute of frauds briefly in one paragraph at the end of the decision. And at that point, the Court noted, quote, where the contract extends to a point in time, be it death or some other circumstance, at which time the full service contemplated will have been rendered, and that point of time could occur within one year, the statute of frauds will not be a bar to the enforcement of the action. Unquote. That's 241 Illap III at 806. And what that makes very clear is that the statute of frauds bars Welch's claim. His own verified Second Amendment complaint makes clear that the business plan contemplated his own performance over a duration of several years, extending out into 2001. Finally, Schaeffer v. Bork, which is another case that he cites, involves the sale of Christmas trees over 12 years. It's a Minnesota case. The plaintiff performed all the labor required and then wasn't paid. So all of the cases that Welch cites where there's an alleged exception based on full performance involve services already rendered over a series of many years pursuant to compensation formulas for which they were not paid. There's not even an allegation anywhere in this case of any alleged right to compensation. Counsel, Mr. Adams maintained during the course of his argument that his complaint complies with Section 2615 of the Code of Civil Procedure. Do you agree with that? I don't, Your Honor. And that segues directly into the second part of our argument, which is that the Circuit Court got it right in affirming dismissal or in granting dismissal based on the statute of frauds. But we believe that the Circuit Court prematurely permitted Welch to proceed on the 2615 argument. And we think he fails for several reasons. First, the Second Amendment complaint is devoid of any specific allegation as to what allegedly is confidential in this plan. In his argument, Mr. Adams says, well, there's synergistic opportunities and potential to create things, you know, that would be helpful to the conference. Those aren't facts. Those are conclusions. And you can't have a breach of confidentiality unless in the first instance there's information that is actually confidential. Where in the Second Amendment complaint does Welch allege that anything in particular is confidential? He doesn't. He just attaches the whole business plan, leaves it up to the court to scour the record, and identify particular facts that supposedly are confidential. It's not this Court's job, it's not the Big Ten's job to try to find facts that might support his claim. Secondly, and this gets back to the point I was making earlier about conflating a breach of confidentiality with misappropriation, you can't have a breach of confidentiality unless there's an actual disclosure. And Welch alleges no facts of any actual disclosure, which is fatal to his claim. The Second Amendment complaint, again, is purely conclusory and points only to an alleged conversion or usurpation of the plan. Those are tort claims or trade secret claims, but they're not a breach of confidentiality. And in this respect, we pointed to in our brief the auto channel case, which admittedly was decided at summary judgment, but involved a case where a plaintiff proposed the concept for the auto channel, which would be devoted to automobile enthusiasts and would involve a lot of issues related to solely automobile-related shows. And the defendant received a number of business proposals, expressed optimism on several occasions that it would be interested in pursuing a joint venture, ultimately declined to do it. And the court rejected the breach of confidentiality claims in auto channel because the plaintiff could point to no limitation on the defendant's ability, after having rejected the plan, to introduce its own channel. That's exactly what happened. The defendant introduced speed vision, which shared some similarities with the plaintiff's proposed business plan. But because there was no limitation on the defendant's right to do that, the plaintiff couldn't claim breach of confidentiality without showing an actual disclosure. There's nothing in the Second Amendment complaint about any alleged disclosure by the conference. The third point I would make on the 2615 issue is, it's very unclear where the alleged offer and acceptance occurred. In response to Your Honor's questions in oral argument, Mr. Adams said, well, the first was on April 23, 1998, and then there's a second acceptance in May of 1998. The first acceptance by itself tells us a lot. Well should already disclose the business plan in advance of April 23, 1998. How do we know that? Delaney's letter says, this letter acknowledges receipt of the business plan, and disclosure cannot accompany a condition that is a prerequisite to confidentiality. That's the keen case that we cited in our case. So you can't just turn over a business plan, even if it's stamped confidential, and then claim that there's a confidentiality agreement. The cat's out of the bag. How is it supposed to happen? You're supposed to say, I have a plan. I'm not going to disclose it unless you first agree to keep it confidential, and Welsh didn't do that here. He turned over the plan, asked Delaney to acknowledge that it was confidential, and everything happened thereafter. Your Honors have asked a number of questions of Mr. Adams about the disclaimer, and we think the disclaimer couldn't be any clearer and vitiates any potential contract in this case. In Exhibit B to the Second Amended Complaint, Commissioner Delaney expressly disclaimed that the plan was Welsh's proprietary property. And in Exhibit C, he disclaimed that any alleged contract existed. Instead, he listed a number of conditions to the existence of any contract whatsoever. First, that the conference had to be satisfied with the further development. Second, that the conference required approvals of the Board of Directors. And finally, that there would be, quote, the negotiation and execution of definitive agreements, unquote. What's interesting is Welsh presents this plan to Commissioner Delaney in April. And then after receiving this letter on April 23, 1998, that's Exhibit B, as well as the letter that's Exhibit C, there's nothing alleged in the Second Amended Complaint where Welsh either expressed  raised Delaney's letter at the May 18, 1998, presentation, or otherwise had any correspondence whatsoever with the conference in the ten years that followed until he filed his lawsuit. We have these April 23 letters, which the Big Ten apparently is trying to proceed very cautiously. And then there's the May 18 presentation. May 18. After that, did the Big Ten write to him and say, we reject them, we accept them, anything? Yes. It wasn't attached to the Second Amended Complaint, but it's alleged in the Second Amended Complaint that several weeks later, the conference reached out to Mr. Welsh and said, thanks, but we're not interested in your plan. So that's included in the Second Amended Complaint. He didn't attach a copy of the writing, but there is a handwritten note from Commissioner Delaney to that effect. And that's the end of it. At no point did, either prior to that May 18 meeting or at any time thereafter, did Welsh ever reach out to the conference and say, well, you know, I presented this plan. Please confirm that you're not going to do anything or that there's any alleged agreement that precludes the conference from developing its own Big Ten network. So when it happens eight years later and there's absolutely nothing in the allegations made by Welsh that precludes the conference from doing so, he can't claim breach of confidentiality. That's a different claim than what he's really alleging, which is misappropriation, in which the Circuit Court correctly threw out the motion to dismiss. The last point I would make, Your Honor, is that both Judge McGrath and Judge Pierce in the Circuit Court told Mr. Welsh to plead specifically whether his contract was oral or written. He never followed that instruction. And there's obviously an important reason under Illinois law why you need to plead whether it's oral or written. There are different statute of limitations on the oral contracts versus written contracts. And while he relies on the O.K. Electric case, which is a second district case from 1982, we cited more recent cases, including the Cable America case, from the first district just in the last couple of years, which affirmed dismissal under 2615 based on the plaintiff's failure to plead specifically whether or not the contract was oral or written or some combination thereof. And for all these reasons, Your Honor, we ask that this Court affirm the dismissal of Welsh's Second Amendment complaint. Thank you, counsel. Mr. Adams, some brief rebuttal. Just to clarify a point, the Rohde case that counsel addressed in his argument and the other Illinois cases, McNerney and the others to which he refers, did not involve a claim that a plaintiff had fully performed and that the plaintiff's full performance defeated a defendant's assertion of the statute of frauds as a defense to a claim under an oral contract. Rohde and the other cases involved partial performance by plaintiffs, not by the indefiniteness involved here. It is the indefinite duration of the Big Ten, the defendant's performance here. And the cases we cited, Cody, Nolskus, the State of Jesmer, all stand for the proposition that just because a defendant's performance might be of indefinite or unlimited duration does not defeat a plaintiff's claim that the plaintiff's full performance defeats a defendant's assertion of the statute of frauds. That is an important distinction here because, as counsel aptly points out, the purpose of the statute of frauds is to protect against bogus claims by plaintiffs of oral contracts. And here the plaintiff alleges in probably half a dozen places in his Second Amendment complaint that he fully performed the contract that's alleged when he disclosed and presented his plan to the Big Ten. That was the extent of Welsh's promise under the contract that's alleged here, and Welsh fully performed. That the Big Ten may have decided not to go forward with additional subsequent agreements between the Big Ten and Welsh to develop Welsh's idea is a distraction, entirely beside the point. The contract here is, Welsh says, I'll give you my confidential information if you'll keep it in confidence. We expect, if the court reverses and remands, that discovery will demonstrate that it is Welsh's confidential plan that he disclosed when he fully performed that ended up in the hands of all of the Big Ten networks' broadcasting partners and has become the Big Ten network. The Trade Secrets Act, the plaintiff here doesn't make any attempt to conflate his claim for breach of a confidentiality contract with a Trade Secrets Act claim. The Trade Secret Act itself explicitly says that a contractual duty to maintain secrecy is not void or unenforceable solely because of lack of durational limitation on that duty. So the Trade Secrets Act here doesn't preempt or exclude Welsh's claims. It explicitly allows them to go forward. For those reasons, we respectfully request that this court reverse the circuit court's dismissal under 2-619A7 in the statute of frauds and remand because, additionally, Welsh's second amendment complaint does state a viable, sufficient, legally sufficient cause of action under 2-615. Thanks very much. Thank you. I want to thank the parties for their arguments and their briefs. This matter will be taken under advisement.